Good morning. May it please the court. I'm John Hester, Jr. I'm here for McCoppen & Associates on behalf of Petitioner Larissa Brigitte Carmel Mballa Bouba Nee Joseph. So we're here for three reasons. One is about corroboration. Another is about death threats as persecution. And the third is about relocation. That topic came up in the response brief. First of all, the record in fact compels the conclusion in this case that it was not reasonable to expect corroboration from the family of the petitioner. The family is located in a refugee camp in the adjoining country from where she fled. They do not have access to much communication except for by phone. As you know, people can communicate cheaply by app. But this kind of communication does not lend itself easily to documentary corroboration such as affidavits that the judge expected to see. What's the record of evidence for that? For which part, Your Honor? That they're not able to communicate other than by phone. When on cross-examination the petitioner was asked whether she remains in contact with anybody in her family, she responded yes by telephone. What's that have to do with whether or not you could produce an affidavit? Well, communicating by telephone is not the same as producing documentary physical corroboration in the form of an affidavit, say, with the identity of the person confirmed in the local country, which may or may not be possible. The petitioner herself was able to apply for and receive a U.S. visa while she was in the same refugee camp. Not a different one, but the same refugee camp. If she could apply for a visa from the refugee camp, would it not be reasonable to think that, because that must have involved some documentary evidence, and would it not be reasonable to think that her husband was able to submit some kind of corroborative documentation? So in this case, Your Honor, the petitioner had already started a visa process before fleeing the country. But it wasn't completed. I'm sorry, her father had been quite ill for some time. It wasn't completed. Yes, that's correct, Your Honor. So she managed to flee with her identity documents, and the reason that the visa was first denied was that her father was not dead yet. She showed up, showed the Americans an obituary that was passed to her by her family, and they decided to grant the visa for that reason. It's not the same as getting a sworn affidavit inside a refugee camp and sending it to the United States. But is it sort of hard to bring a trial judge or a trier of fact up short by saying that the trier of fact is saying, you know, I would like some additional evidence here to corroborate the story and to better test the petitioner's own credibility? Yes, Your Honor. When a trial judge wants that kind of thing, you know, to do his or her job properly, it seems kind of unfair to the trial court to say, no, you can't have the evidence that you want to make your findings more supported. Well, Your Honor, it is infinitely more unfair once the record of evidentiary submissions is closed by the same court, for that court to say, we find this petitioner, we find this alien credible, but we're going to require corroboration anyway. That's a game of gotcha after the record is closed for submission. There is no indication that corroboration in documentary form should or would have been required. If the record were still open and if we had the courts leave, we may be able to find something or at least to determine whether or not it would be reasonable to ask for that kind of corroborative evidence. But the only answer that she gave in response to this was on cross-examination. It was a series of no's. Have you got an affidavit from this person, from this person, from this person? No, no, no. The court did not bother and neither did the government to ask why. And so if we're going to have a denial based on a question that wasn't even asked, why don't you have it, then I find that much more unfair, Your Honor. Well, she bears the burden of proof overall in establishing a claim for asylum. Yes. And so it would seem to me that this incident is critical. Yes, Your Honor, but what we have here is... And so if she bears the burden of proof and the incident's important and the evidence is obviously important, then the trial fact would bolster her case considerably if it could be provided. And the suspicion is that the reason it wasn't provided is that it maybe could not be provided. Well, if it could not be provided, then maybe because it's unreasonable to request such documentary evidence from a refugee camp. That aside, Your Honor, the... Yeah, but you would have to have some evidence of that. I mean, all I've taken from the briefs and the record is that that's just your speculation. Well, Your Honor, nobody asked her why she didn't have it. If this alien had been required with an open evidentiary record still to submit things or if the judge had even indicated, you know, we're going to need something more, then we definitely would have made that effort before the record was closed. Now, the testimony of a credible alien is sufficient to carry one's burden for asylum purposes. When corroboration is required, and, you know, it's got to be reasonable, it can't just be deemed required in the face of a good credibility determination. It is the law of the land that, in fact, credible testimony on its own may be sufficient. We have to look at the immigration judge's reasons for requiring or at least some indicia that it's reasonable to require that anybody else coming from the situation should have the same access to information. And as to death threats being persecutory, this circuit has held that death threats made by those immediately capable of carrying them out may constitute persecution. In this case, we don't have a direct we are going to kill you threat, but we do have two mercenaries from a rebel group, an international rebel group, that has come and knocked over the Capitol. Is there record proof of that? I'm sorry? Is there record proof of that? Yes, Your Honor. I believe that there is sufficient record proof of that, that there are foreign fighters in this group. Okay. So maybe there are foreign fighters in the country. How does that connect up with the alien in this case? Well, when these fighters come up to her house armed and tell her to stop praying at home, I think the threat is pretty well made, even without them saying, or we will kill you. These mercenaries have been killing Christians in the Capitol. They're quite notorious for it. In fact, they've been doing it all over the country, but it was especially bad in the Capitol. It would have been easy enough for them to actually use more threatening language. But they did not. It may have been, but there's no reason to expect people who have just sacked the Capitol to discuss with people and stop praying. Is there record proof that the two folks that came up to this house are connected with some mercenary here? Well, the petitioner's credible testimony identified them as members of SELICA, that Muslims are identifiable visually in this country because of their scarification and their clothing. That may be, but that doesn't make them mercenaries. The fact that they were armed and not government soldiers and that the SELICA had just invaded the Capitol, I think it's pretty clear that they were SELICA. That's well documented. State Department reports and everything, but CAR is just a very dangerous and unstable country. That is true, Your Honor. And the same authorities and some others that are in the record predict that this will result in a generational, at least one generation of sectarian problems, divisions that did not necessarily exist before. And by the way, this petitioner is not even racially or ethnically a member of any central African group. She is of Haitian descent. She does not look like a local. She sounds like a local, but that gets a lot of questions. Kind of like, wow, you speak really good. Where did you learn that from? Moving on to relocation, the country conditions in the record indicate that the capital of Bangui was the safest as of the petitioner's testimony, but she hadn't even been there for a year by the time she testified in immigration court. So the documentary country conditions are probably the best indicators as to what's actually going on there. The respondent said that the rebels were kind of pushed back to one area, but in fact we see that security is only present and tenuously so in the capital. There was one interview with the then president that's in the document submitted in the record that indicates how incompetent, just unable to protect the country that the security services are. They're still dependent on international support. Makes no mention of the countryside because they're not there. So the respondent seems to suggest- But the CAR is a majority. I mean, your claim of asylum is based on religious persecution. Yes, in part. The majority of persons in the CAR are Christian. That is correct, but that did not stop these Muslim rebels from knocking over the whole country. And if it happened before, it can certainly happen again. There are many cases where you have conditions of unrest in a country, but they're very uneven. And the area of Muslim control here, I thought, was in the northeastern sector of the CAR. And much of the rest of the country, well, three-quarters of it, was fairly safe to go with. Well, the Seleka are not actually disbanded, so it's hard to tell. I mean, they were disbanded in an official, perfunctory sense, but they're still around. It was a concentrated area of influence, was it not? I mean, we know that there are many, many, many countries which, if you look at the country as a whole, there's religious strife. Yes, sir. And I guess Iraq is a prime example of where you have the southern part around the port is primarily Shia, and then you go to the western part of the country, and it's an Anbar province, and it's different. Yes, Your Honor. It's Sunni, and then in the northern part, you have Kurds. But it's very safe for a Sunni to be traveling in Anbar. Perhaps. And it's relatively unsafe to be in that southern port of Basra, I think is its name. And so what I'm saying is these are geographical spheres of influence within many, many countries. Yes, Your Honor. And the respondent is suggesting that this petitioner finds safety among the anti-balaka, that is the militant faction of Christians that are equally terroristic, would face reprisals, they would be a target for any further Muslim insurgency. Her husband happens to be from the north, so he, I guess, looks, sounds like, anyway, he's a northerner. He's relatively identifiable. His ethnic group is Baka, that is in the record, and she herself looks foreign. So I'm not sure why the respondent would counter that some other place that happens to be run by terroristic Christians would be any better. I'm sorry? The petitioner's daughter has remained a resident of the Central African Republic. She is not in the custody of the petitioner. She lost custody of her daughter to her ex. I don't think they were reneged. Your Honor, that's wrong. The point is, through all of this, she has remained without any problem. I don't think that's in the record, Your Honor, that she doesn't have any problem. But she did remain, but she's in the petitioner's communication. Her daughter? Her daughter does not live with her, Your Honor. She has a biological child that doesn't live with her. You talk about, well, threats to family members, but has her daughter been harmed or threatened in any way? We don't know. That question was never asked. Well, wouldn't that be, I mean, you bear the burden, wouldn't that be part of your case? I'm out of time, but may I respond? The burden is on the government to show that she can be relocated to a safe place. Yes, Your Honor. Go ahead. The daughter that doesn't live with her, that's not part of her visible family group, is likely not very relevant to an analysis of how this petitioner and her family unit would be treated if they were found. We're talking about a woman who looks Haitian, a man who's from the northern part of the country, and sectarian violence that's ethnic as well that goes north to south. Thank you. Thank you, counsel. Ms. Greer? May it please the Court. I'm Christina Greer on behalf of the respondent, the United States Attorney General. The government does not dispute that the population of the Central African Republic has experienced violence and civil strife and is sympathetic to petitioners' wish to remain in the United States. However, to do so, she must establish that the record compels the conclusion that she sufficiently corroborated her claim and that she has a well-founded fear of being persecuted if returned to the Central African Republic, and she has done neither. Regarding corroboration, the agency properly determined that she did not sufficiently corroborate her claim. First, as the Court noted, it is her burden to produce evidence to corroborate her claim. Here, she did not do so. She was questioned as to whether she submitted certain affidavits from family members, and she stated she did not, but when given the opportunity, did not explain. Furthermore, as was also pointed out, there is no evidence that... You finished on that one? You finished on that one? I just want to... Yes. What about the fact that, undisputed, that families live in tents in a refugee camp in another country? It is undisputed that the family lives in a refugee camp. However, there is no evidence in the record showing that they do not have mail service. Mail service in a refugee camp in Cameroon? Mail service? Petitioner even stated she was able to obtain an obituary from her father, or for her father, while in the refugee camp. An obituary in terms of having the respect for the dead and their family, being able to get that out. That means that there was a mail running in the tent along the refugee camp? It is a UNHCR-run camp, which runs... Which means what? That means that it's run by an internationally recognized organization that does... They fight each other. In Cameroon? No, I'm talking about the whole situation, the whole region. It's a regional situation. It is. It's like in Sudan. How many people fled to... Go ahead. But she was able to get documents from family members in the United States. That was where the obituary came from. Her father was here in the United States. She was able to obtain that in Cameroon. And within enough time to be able to apply for a visa, obtain the visa, and come to the United States before the funeral. There's nothing in the record. She was in that camp, and she would know if there had not been mail service. But there's nothing in the record suggesting that there was not some way for her to obtain, for her husband, whom she talked to regularly. Was that asked of her? I think you also make a good question. Here you're coming and saying, well, she didn't say this. If those things were important, why weren't they asked of her? Instead you closed it. It was asked of her? Is there mail service now? No, that was not asked of her. What was asked is whether she submitted those affidavits, and she stated no. But never to follow up as to why not. And her attorney could have asked her that, but didn't on redirect examination. And additionally, her attorney could have asked for a continuance to obtain that information. By requesting, do you have an affidavit from this person or this person, that put her on notice that those things are potentially important, but she never requested additional time to submit those. Maybe because they would have been futile because she can't. She can't submit them. Then they could have asked. Asked for what? A continuance? For what? She could have asked for a continuance to obtain the information. But if they're not obtainable, what would a continuance do? Her attorney should have asked her why she did not have that evidence. That it's her burden to submit evidence. And if she had said, I don't have them because they're not available, would that have been enough? Probably not. There needs to be a reason. It's her burden to establish why she does not have it. And the purpose of this corroboration requirement is especially in claims that are like this one, which are essentially simple. It's easier to fabricate such claims. And having some sort of corroboration is extremely important in order to determine that this is a valid claim. But she submitted no evidence relating to her personal circumstances. It's entirely country conditions reports, which is understandable. But if there is some form of evidence available, she should have submitted it. And this court has found that where an ---- But she was found to be credible when she talked about how people came to her and said, you better stop praying. Yes. That's credible. Yes. And in order to practice her religion, it is boisterous. It gives joy to the heavens, drums and celebration. So I think the law is you don't have to change your religious practice in order to become safe. Do you agree with that? Yes, I agree with that. And then the question about was it threatened. People were armed when they came to her and said, I don't think it will take much of you to be holding an AK-47 and say, I think you ought to stop praying. You think you need to say, oh, I'll kill you, to be a threat? I mean, practically speaking, if I was holding an AK-47 and I told you, I think you better stop walking across the other side of the street. You think I need to say, oh, I'll kill you, to be threatened? Not necessarily. Not necessarily at all. There are other, like you suggest, there are other ways to show that this is a threat, such as AK-47 is a good way to do it. If a police officer was handing, or a similar, it is important to look at the context of the situation. That is a good context. An AK-47, somebody telling you, you better stop praying. That's not enough. She said they said stop praying, not you better stop praying, but just based on the. That's why, remember, I didn't say better. I said stop praying. I didn't put better in there. Oh, I apologize. Oh, stop praying. Or maybe I said, okay, I'm going to change it. Stop praying. And I'm holding an AK-47. Is that a threat? It could be. Is it a threat? In the context of you living in the CAR, the number of tens of thousands of people have been killed because of their religious beliefs, would that be a threat if someone is holding an AK-47 saying stop praying? It could be, especially considering the emphasis. So that's the best you're going to do is could be. Yes. It depends as, in your example, the emphasis. I'll follow you. Okay. Because you put emphasis on the. Prayers.  Essentially, the body language and the emphasis that you were putting on the phrase is one indicator of it being a threat. That's why we have a fact finder. Yes. And that's why we have an IJ to try to determine context. And, you know, the standard is a well-founded fear of persecution. And I don't know who it was that delivered these threats. I don't know what the context was. That's why we have a finder of fact. And the finder of fact felt incredible, right? Yes, the founder of fact, yes. And it certainly falls well short of the kind of threats that we found tantamount to persecution. Correct. Particularly in Hernandez Avalos and in Crespin Valladares, in both of those cases, the petitioners were specifically threatened with death. I believe it was in Hernandez Avalos that the petitioner, that the gang members, held a gun to the woman's head and said, we will kill you if. Whereas here, there's one incident, which undoubtedly, there's no question about her subjective fear in this situation. But in that talk, there was one incident. These people never came back. We don't know specifically whether they were from the Salika. She said. That's because she left, didn't she? She left. Didn't she leave? She did. Well, how do you know if they came back or not? Because a few days after that incident, the Salika were pushed out of the capital of Bangui, and that's where she lived at the time. And so even if she had remained there, the rebels would not have been able to come back. But in the country reports, as you know, this is not a place with a clear DMZ. It moves, control moves from time to time, from day to day, where the push is. Is that correct? It's a fluid order, if you will, in terms of who's in control and where they're in control. At the time of the. . . Is that correct? State Department reports? They're all over. It's not limited. It did appear from the State Department reports that there was a demarcation where the Muslim Salika were controlling the northeast and the anti-Balaka Christians and the government controlled the southwest, and that this was for the most part stable, including the rebels in the northeast declaring their own state with specific borders. Well, wasn't the Christian leader deposed by then? Yes, in 2013. But then in. . . And they did that in spite of having such a minority of members in that country. Isn't that an indication of how much force they have of violence and gun power? Doesn't it? Wouldn't it? It does, but not necessarily in the future, because that was a unique situation where multiple rebel groups came together. Salika means alliance, and it was an alliance of multiple different Muslim rebel groups that didn't have much power on their own. They came together for the specific purpose of overthrowing the government, and they succeeded for a short time. And right thereafter, the leader of that group ordered them disbanded. And while, yes, they're still what many of the reports called ex-Salika fighters, they've gone back to their old individual groups and each controls some territory. The important thing is there's no indication in the record that those groups have talked about or planned another coup or that they're working together in any way to do that. But also now, unlike before, there are U.N. peacekeepers, there are French troops in the capital to help the government of the Central African Republic during the transition back to governmental power. Didn't the evidence show that there were a number of persons who had left the CAR that are now returning? Yes, Your Honor. In fact, at the time, on page 156, the 2015 Human Rights Report states that during 2015, the security situation improved and hundreds of thousands returned to their homes. At the height of the conflict in January 2014, there were 922,000 persons displaced. But by the end of 2015, approximately 417 were displaced. So about half of the people who had been displaced at the height of the insurgency had been returned to their homes. What do you say the situation is with respect to petitioners, Christian daughters? From what I can tell, and that was what I was looking at at the very end and scrambling around to get my stuff back together, in the record there's no indication that her daughter has had any issues. She stated that she continued to talk. She's living in the CAR. Yes, she is living in the CAR. And that's discussed at pages 97 through 100 in the record, her discussions with her daughter. Did the petitioner say that she had had any issues? No, she did not. She stated that she talks with her regularly, but there was no indication that her daughter has any issues. Is her daughter practicing religion in the same way she is? I don't know specifically, but she did say her daughter is Christian. Yeah, but not only is she Christian, it's because of the way she practices it. A lot of people claim to be Christian, but the way they practice it, you can't even tell. Maybe you can tell the way she practices her Christianity. The way that she framed the group as Christian, not as Christians who practice in a certain way, such as a particular social group, she's saying it's because of her Christian religion that she will be persecuted. And so how her daughter is affected does relate, as her daughter is also Christian. Well, I understand it's related. I mean, for example, Catholics are Christian, so are Jehovah's Witnesses, so are Baptists. I'm not trying to be a theologian today, but you do know that Christianity is a lot of different Protestant things, correct? Yes. So you don't know what, do you know on the record how she practices her Christianity, her daughter? No, I do not. Right, so you don't know that. But we do know that people are still living in refugee camps in other countries. Are you talking about today or at the time that this was adjudicated? Today. Yes, even today people are still living in refugee camps. Because you're going to send her back to, I hope it's not, but potentially doomed today, not 2014. It's today we look at it. That's why it's future persecution. It is, but we look at what's in the record. If there's a different situation today as well there may be, that would be subject to a motion to reopen, which there are no deadlines for. The point of the motion to reopen is if there are changed circumstances she can file a motion to reopen saying, this has happened since the adjudication, the situation is worse, now there's been a change to my specific claim and I want the court to look at my asylum claim. She can do that. Even if the petitioner's petition for review was denied, she would still have the ability to file a motion to reopen? Yes, if she can show that conditions have changed. But you just said there are no changed conditions. Everything is getting to be rosy again now. As of what's in the record, I cannot make representations outside of the record. You'll be saying the same thing to her petition for a changed condition, as you told us today, that things are getting better. As long as she, if she doesn't submit any more documentation, then yes. That's the purpose of submitting more country reports and updating the record. The record that we have here is from the IJ's decision in 2015. Actually, I think the most recent article in there is from March 8th, 2016, and it even talks about how the city of Bangui had previously been a hotbed for violence, but that the violence receded under a transitional government supported by international peacekeepers and supported by France and the UN. So that's the information that we have as of the time this was adjudicated by the immigration judge and then reviewed by the Board of Immigration Appeals, and that's what the court is reviewing, those decisions, not how the situation is today. If there have been changes in the situation, that would be properly brought before the agency in a motion to reopen, which she can submit with new evidence, with updated evidence, to show what's going on today. But that's not what the focus of the petition for review is. So if there are no further questions, the government respectfully requests that the court deny this petition for review. Thank you. Thank you, captain. Mr. Hester. In response, I would remind the court that if corroboration were required across the board, she said that the government, I'm sorry, said that this is an important thing across the board, that the REAL-ID Act would not focus so much on credibility itself if corroboration were always so required as to be expected, that the threshold for protection under our asylum statutes is a 10 percent prospect of being subject to being persecuted.  Supreme Court case Cardozo-Fonseca established that 10 percent threshold. So in light of the fact that the rebels have knocked over this country before, set it on fire, and killed a lot of people, I think that normally, perhaps, a country that's only 15 percent Muslim might not face a 10 percent chance of this happening again. But I don't think that it's reasonable to say the same of the Central African Republic. Things have not improved. I'll also point out that we can distinguish this corroboration situation from the controlling Singh case, which was about a family living in India. They were politically active. They never left India. The applicant came through Mexico to the United States on a Mexican student visa. And so it would be reasonable to just write home to India to get some corroboration. Here, though, we've got, not to use terms too presidential, but people running from hole A to hole B, people living in tents. And they're also subject to a lot of the same dangers as they were facing in the Central African Republic, because this is often a border problem. So I think that if she is returned, she'll end up in that refugee camp again. She won't be very safe. I think that she's met her burden in showing the unreasonableness of the government's requirement for corroboration in this particular case. Of course, we should get corroboration as much as possible, and whenever it's reasonable, before we give somebody an asylum award. But nothing she said was up for dispute. This is just analysis. None of the facts were questioned that she presented. And if this is being denied— And I don't want to appear unsympathetic, because I'm not, but the question is not what conditions one may experience upon retirement. The question is whether there's a well-founded fear of persecution. Maybe this statute should be broadened, but the way it reads now is there has to be a well-founded fear of persecution. So either in the tent city or in her own country, I believe that she does face a 10 percent chance of persecution, at least, because the religious troubles are not over in this country. And the Fourth Circuit precedent said that amount could be sufficient. Yes, Your Honor. I remember the case very well. Yes, Your Honor. And if this is going to be denied because of questions that weren't asked after the judge closed the record, 15 days before the hearing, that would just be something that would compel a reversal. And if there are no more questions, I'll thank the Court. For those reasons, we believe that petitioners' petition should be approved. Thank you. Thank you. We'll come down to the Council and proceed to our last case for the morning.
judges: Roger L. Gregory, J. Harvie Wilkinson III, G. Steven Agee